**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Samuel A. BITHONEY et al.,**
**Defendants-Appellants.**

**Nos. 264, 265, Dockets 72–1463, 72–1464.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 12. 1972.

Decided Jan. 8, 1973.

John P. White, Jr. and Monroe L. Inker, Boston, Mass. (Crane, Inker & Orteri, Boston, Mass., on the brief), for defendants-appellants.

John T. Sullivan, Jr., Asst. U. S. Atty., W. D. N. Y., Rochester, N. Y., for plaintiff-appellee.

Before FRIENDLY, Chief Judge, and MEDINA and ANDERSON, Circuit Judges.

MEDINA, Circuit Judge:

Samuel A. Bithoney and Albert S. Bithoney appeal from judgments of conviction, entered upon the verdict of a jury, after a trial before Judge Burke in the District Court for the Western District of New York, for violation of 18 U.S.C., Sections 1015 and 2. The charge is that Albert made a false acknowledgment that (Count I) Barbara Encao Irenze appeared before him and took an oath with respect to information contained in a "Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa," that he signed the name of Samuel, his father, to this acknowledgment knowing that Barbara Encao Irenze did not appear before him and make such acknowledgment either on the date specified, August 4, 1970 or at any other time; and that Samuel aided and abetted (Count II) the making of this false acknowledgment. The physical fact of signing the acknowledgment is alleged to have taken place in Boston, Massachusetts, and the petition including the false acknowledgment is alleged to have been submitted to the Immigration and Naturalization Service in Buffalo, N. Y., in the Western District of New York. Similar allegations are made against appellants in Counts III and IV with reference to the taking of another false acknowledgment that Susan Osborne Irenze appeared and took an oath with respect to a similar petition, knowing that Susan Osborne Irenze did not appear and make such acknowledgment on the same date or at any other time. Samuel was given concurrent suspended sentences, on each Count, of imprisonment for 1 year, probation for 1 year and a fine of $500. Albert was given similar concurrent suspended sentences for 1 year, probation for 1 year and no fine. There is a stay pending the disposition of this appeal.

On June 5, 1970 orders to show cause were issued in deportation proceedings against two brothers, Aurelio and Giuseppe Irenze, who were born in Italy and who had overstayed their leave without permission of the Service. The younger brother Giuseppe had entered the United States at Miami, Florida, as a crewman on a vessel and was required to leave on or before January 23, 1970. Aurelio was admitted also at Miami as a nonimmigrant visitor for pleasure and was required to leave on or before March 30, 1970. They both lived in Rochester, N. Y.

Doubtless anticipating deportation proceedings, the two brothers, on the recommendation of a friend, Anthony Maddalena, went up to Boston to consult Samuel A. Bithoney, a lawyer, who was supposed to be an expert in immigration matters. There on December 3, 1969 Samuel signed a receipt that is in evidence reading "Received of Aurelio Irenze $2000 as part payment on immigration matter." The mother of the two boys, Assunta Irenze, was in a plight similar to that of her sons, and Samuel represented her too.

The hearing on the two orders to show cause took place before Special Inquiry Officer William B. Taffett in Buffalo on July 6, 1970. These orders to show cause had originally been returnable on June 22, 1970, but Samuel had obtained an adjournment. Samuel was present. It was developed that there was no defense to the deportation proceedings. The regular quota for Italian citizens was several years behind and

neither of the boys had any skills to qualify for a Skilled Workers Preference. Samuel admitted that they were both deportable. But he casually remarked that the two boys had married American citizens and that Assunta, whose husband had not been heard of for 20 years, had also married an American citizen. Samuel said "I didn't know this until today." When asked if he had any application to make, Samuel requested 90 days for voluntary departure. The upshot was that he was given 60 days, but on July 14, 1970 he filed an appeal giving as reasons: "The facts are contrary to the law. The law is contrary to the facts."

Aurelio was married to Barbara Encao on June 23, 1970 and Giuseppe was married to Susan E. Osborne on July 2, 1970, both at Rochester.

The testimony of what occurred before the petitions of the wives were filed with the Service in Buffalo on August 19, 1970 covers a wide field and, if believed by the jury, would have indicated that Samuel suggested the fake marriages, that he formulated the false answers that were to be given by the girls and their husbands at the investigation that was sure to and did follow the disclosure of the marriages, and that the whole scheme was devised and supervised by Samuel from his Boston office. But the jury disagreed on the conspiracy count of the indictment (Count VII) and also on Count VI in which Samuel was charged with aiding and abetting Aurelio in making false statements in his interview with an immigration investigator on October 13, 1970 at Buffalo. Samuel was acquitted on Count V which charged him with presenting Barbara's petition to the Immigration and Naturalization Service at Buffalo on August 19, 1970 knowing it contained false statements. In any event, we are only concerned here with the allegedly false acknowledgments charged in Counts I, II, III and IV.

As to these acknowledgments, there was a clear conflict in the testimony ad-duced by the government, on the one hand, and the denials and explanations of the Bithoneys, on the other. The two brothers, and the two girls and others, testified that the two petitions were blank when the girls signed them in Rochester, that no member of the Irenze family group was in the Bithoney law office in Boston in August, 1970, that neither of the girls was ever in Boston in their lives and never swore to anything before either of the Bithoneys or anyone else. The brother-in-law Anthony Liccione testified:

Q. I show you G–7, and I direct your attention to the back page, and there is a signature entered there, Barbara Encao Irenze. Did you see that signature entered?

A. Yes. They signed this in my living room in my home.

Q. Who was there?

A. Barbara, Sue, Pino and Aurelio.

Q. I show you G–8, and I direct your attention to Block III and there is a signature, Susan Osborne Irenze. Did you see that signed?

A. Yes.

Q. Who signed that?

A. Susan.

Q. Did you see her sign it?

A. Yes.

Q. Where was it signed?

A. On the dinette table in the living room.

Q. Was it signed at 755 Jay Street?

A. Yes.

Q. The same time G–7 was signed?

A. Yes, the same time.

Q. Was Mr. Samuel Bithoney present?

A. No.

Q. Was Albert Bithoney there?

A. No.

The background to the signing of the petitions in blank by the two girls was furnished by the testimony of Aurelio backed up by exhibits. After the depor-

tation hearing in Buffalo on July 6, 1970, Samuel and the Irenzes went to a conference room in the Courthouse. Samuel procured a number of blank I–130 forms of "Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa." They all sat down at a table and Samuel explained how these forms were to be filled out, making notes on a copy that has since been lost. He gave Aurelio this form and also four more which were entirely blank. The instructions were that Aurelio was to fill out two of these as well as he could from the sheet that has been lost, have the two girls sign two others completely blank, except for the two signatures, and then send them all to the Bithoney office in Boston. There they would be filled in by typewriter from the two containing data to be written in by Aurelio according to directions, with such additions and corrections as might be necessary.

We may assume that the jurors credited this testimony and concluded that the envelope that arrived by mail in the Bithoney law office in the early part of August, 1970 contained the two forms made out by Aurelio, misspelling and all (Exhibits G–21 and G–22), the two forms entirely blank except for the signatures of Barbara and Susan, and perhaps a birth certificate or two. And the jury would also have been warranted in finding, contrary to the testimony of the Bithoneys, to which we shall refer in a moment, that Samuel or Albert, or both, decided how the blanks should be filled in, including the insertion of "Halifax" and other data, caused Joseph Bithoney to fill in the blanks on his typewriter, also wrote out and signed the acknowledgments, although the girls were never in Boston and had never taken an oath or acknowledged before any Notary that they had executed the petitions; and that then the Bithoneys had caused the petitions, containing the false acknowledgments, to be filed with the Immigration Service at Buffalo on August 19, 1970.

Samuel testified in his own defense that on Saturday, August 8, 1970, Aurelio, Giuseppe, Tony Liccione (the brother-in-law) and two young ladies came to his office in Boston, and that he had previously received from Aurelio by mail on August 6, 1970 the two petitions "completely filled out" and typewritten. He could not remember whether or not the petitions had been signed by the two girls before he received them from Aurelio. He said the information in the petitions had been previously furnished by Aurelio and the typing in his office had been done by his son Joseph, who worked in the office. As to the signatures and acknowledgments:

Q. When these people came to your office, will you tell us what happened, step by step on that occasion, on August 8th, 1970?

A. When the girls came in with Mr. Liccione and Aurelio Irenze and also Giuseppe, Aurelio said, "This is my wife."

She seemed to be a dark-haired girl and said that she was his wife, and he pointed to the girl on the right, who was the blond girl, and said, "This is Giuseppe's wife."

I said, "All right." So we pulled out both of them, and I don't remember whether the signatures were on there, or whether or not I had them sign it at that time. If the signatures were on there, I'm pretty sure I asked them to acknowledge their signatures.

THE COURT: What?

THE WITNESS: I'm pretty sure I must have asked them to acknowledge their signatures on there.

THE COURT: You don't remember?

THE WITNESS: I don't remember, Your Honor. I don't recall—I mean absolutely. Then at that time, what they did, they sat for just a short time, and the girls didn't do too much talking.

The two petitions are dated August 4, 1970. The jury may have inferred that

Albert in his testimony changed the date when the acknowledgments were supposed to have been taken from Tuesday, August 4, as stated on the face of the exhibits, to Saturday, August 8, because of the improbability that working people would come from Rochester to Boston on a Tuesday.

One of the consequences of Samuel's voluntary appearance before the Grand Jury was that both he and Albert signed waivers and thus provided incontrovertible and authentic exemplars of their handwriting. The importance of this was that, while the indictment charges that Albert signed the name "Samuel A. Bithoney" as the Notary Public taking the acknowledgments, both Samuel and Albert testified that it was not Albert but Samuel who signed. If the jury believed this Samuel and Albert might well have been acquitted on Counts I, II, III and IV. But the expert testimony was to the effect that Albert did sign the name "Samuel A. Bithoney" on both petitions and this testimony was evidently credited by the jury.

Albert and Joseph, each of whom worked in his father's law office in Boston, testified, but there was a strange lapse of memory as to who wrote in "this *4th* day of *August*." Samuel testified he was "pretty sure" his son Albert had inserted "4th" and "August". This same lapse of memory relates to whether or not any of the Bithoneys saw either Barbara or Susan sign the petitions. Very little, if anything, is said about administering the oath to either of these petitioners.

If the testimony above summarized was credited by the jury, there was ample proof of aiding and abetting by Samuel.

What broke the case was the fact that, while the investigation was under way, one of the girls, Barbara, suddenly realized she might wind up in jail and she "spilled the beans," as she put it, and confessed that the marriages had not been for love but for money and that the whole business was a means of keeping Aurelio and Giuseppe in the United States.

We conclude that the government proved its case. We now turn to the multifarious claims of error which are said to require a reversal of the judgments.

### Venue

■■ The only substantial question raised by appellants is that, in violation of the Sixth Amendment requiring a "public trial, by an impartial jury of the State and district wherein the crime shall have been committed," appellants were tried and convicted in the Western District of New York for a crime alleged to have been committed in Boston. Without making a long story of it, the government claims that when 18 U.S.C., Section 1015(d)[1] makes it a criminal offense against the United States to knowingly "make" any false "acknowledgment or statement concerning the appearance before him or the taking of an oath or affirmation or the signature, attestation or execution by any person with respect to any * * * petition * * * required or authorized by the laws relating to immigration, naturalization, citizenship, or registry of aliens," the crime is not complete until the petition is filed or presented to the Immigration Office at the place where the petitioner resides. We think this makes sense. While there is not much case law to support this

---

1. 18 U.S.C., Section 1015(d) :

 Whoever knowingly makes any false certificate, acknowledgment or statement concerning the appearance before him or the taking of an oath or affirmation or the signature, attestation or execution by any person with respect to any application, declaration, petition, affidavit, deposition, certificate of naturalization, certificate of citizenship or other paper or writing required or authorized by the laws relating to immigration, naturalization, citizenship, or registry of aliens—

 Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

view, there are no cases to the contrary that our research has disclosed. To hold that the mere writing out of a false acknowledgment which is immediately destroyed and never filed, presented or in any way used to obtain relief in any court or administrative agency seems to us to be a result that was never contemplated by the Congress when this statute was enacted.

The indictment charges, for example in Count I, "that on or about the 4th of August, 1970, in the State and District of Massachusetts Albert S. Bithoney did knowingly make a false acknowledgment and statement concerning the appearance before him and the taking of an oath by Barbara Encao Irenze * * * submitted to the Immigration and Naturalization Service of the United States Department of Justice as required by Section 204 of the * * * Act, Title 8, United States Code, Section 1154, at Buffalo, in the State and Western District of New York * * *." The filing of such a petition as we have here is specifically authorized by 8 U.S.C., Section 1154(a),[2] and the Regulation 8 C.F.R., Section 204.1(a) is similarly explicit. It provides:

A petition to accord preference classification under Section 203(a)(1), (2), (4), or (5) of the Act or classification as an immediate relative under Section 201(b) of the Act, other than a child as defined in Section 101(b)(1)(F) of the Act, shall be filed on a separate Form I–130 for each beneficiary and shall be accompanied by a fee of $10. The petition shall be filed in the office of the Service having jurisdiction over the place where the petitioner is residing in the United States.

As both petitioners reside in Rochester, the Immigration Office having jurisdiction is in Buffalo and that is where these two petitions were filed on August 19, 1970 as attested by the Government Stamp.

■■■ In determining proper venue in a criminal case a court must ascertain the situs of the crime, realizing that a crime can be started in one district and finished in another. The Supreme Court has repeatedly held that venue depends on the locus of the crime. See, United States v. Cores, 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958); United States v. Anderson, 328 U.S. 699, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946). This in turn depends on the nature of the crime charged. See, Travis v. United States, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961). The venue provisions of the Sixth Amendment and Federal Rule of Criminal Procedure 18 do not provide a defendant with a constitutional right to trial in his home district. See, Platt v. Minnesota Min. & Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964); Johnston v. United

---

2. 8 U.S.C., Section 1154. *Procedure for granting immigrant status—Petition for preference status or immediate relative status; form; oath*

(a) Any citizen of the United States claiming that an alien is entitled to a preference status by reason of the relationships described in paragraphs (1), (4), or (5) of section 1153(a) of this title, or to an immediate relative status under section 1151(b) of this title, or any alien lawfully admitted for permanent residence claiming that an alien is entitled to a preference status by reason of the relationship described in section 1153(a)(2) of this title, or any alien desiring to be classified as a preference immigrant under section 1153(a)(3) of this title (or any person on behalf of such an alien), or any person desiring and intending to employ within the United States an alien entitled to classification as a preference immigrant under section 1153(a)(6) of this title, may file a petition with the Attorney General for such classification. The petition shall be in such form as the Attorney General may by regulations prescribe and shall contain such information and be supported by such documentary evidence as the Attorney General may require. The petition shall be made under oath administered by any individual having authority to administer oaths, if executed in the United States, but, if executed outside the United States, administered by a consular officer or an immigration officer.

States, 351 U.S. 215, 220–221, 76 S.Ct. 739, 100 L.Ed. 1097 (1956). Instead, they embody the principle that a defendant must be tried in the district where the alleged crime was committed.

 It has been suggested that the answer to a venue problem is available by selection of the verbs defining the criminal offense, and then subsequent study of these verbs will permit the court to ascertain the situs of the crime. See, Wright, Federal Courts, § 43, p. 161 (2d Ed.1970) and Dobie, Venue in Criminal Cases in the United States District Court, 12 Va.L.Rev. 287, 289 (1926). While such an approach is indeed helpful, it cannot conclusively determine venue, for the court must still scrutinize other parts of the statutory provision in order intelligently to ascertain when the defendant's actions have progressed to the point where a court can confidently conclude that a crime has been committed. Thus, for example the petitioner in Travis v. United States, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961) did not violate 18 U.S.C., Section 1001 when he "knowingly and willfully falsifie(d)" an affidavit until he filed the affidavit, for only at that point was the remainder of the statutory provision, "in any matter within the jurisdiction of any department or agency of the United States," satisfied. Likewise, we believe that a violation of 18 U.S.C., Section 1015(d) is not completed when the appellant "knowingly" made a false acknowledgment concerning the appearance before him of Barbara Encao Irenze and Susan Osborne Irenze. Rather the criminal statute requires the false certificate, acknowledgment, or statement to be made with respect to a paper or writing "required or authorized by the laws relating to immigration." These laws include 8 U.S.C., Section 1154(a) and 8 C. F.R., Section 204.1(a) which require the petition to classify to "be filed in the office of the Service having jurisdiction over the place where the petitioner is residing in the United States." Thus as we read 18 U.S.C., Section 1015(d), a violation only occurs when the false statement made upon a paper required by the immigration laws is actually used for a purpose required by those laws. In this case that purpose is to alter the status of certain aliens and that purpose can only be effectuated by filing the paper in Buffalo.

We have not found any case concerning venue arising out of 18 U.S.C., Section 1015. An analogous situation exists, however, in prosecutions for aiding the preparation of a false or fraudulent tax return. In United States v. Newton, 68 F.Supp. 952 (W.D.Va.1946), aff'd 162 F.2d 795 (4th Cir. 1947), cert. denied 333 U.S. 848, 68 S.Ct. 650, 92 L.Ed. 1130 (1948), the defendant was tried in the Western District of Virginia where he allegedly aided in the preparation of a false return, affidavit, claim or document. The trial and appeals courts rejected his contention that venue was only proper in the Eastern District of Virginia where the tax return was filed. The Fourth Circuit strongly intimated that in effect this was a crime committed in two districts and venue would lie in either one. The trial judge in words most appropriate to the case now before us observed:

> If the defendant should assist a taxpayer in the preparation of the most dishonest or fraudulent kind of a return, and then immediately have a change of heart, tear up the document, and throw it in the wastebasket, it is inconceivable to me that he should have committed a crime. 68 F.Supp. at 954.

Thus, assuming that the filing of the claim was an essential element of the crime charged, the court in *Newton* still held that venue was proper in the district where the crime began. See, also, Kowalsky v. United States, 290 F.2d 161 (5th Cir.), cert. denied, 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76 (1961), and United States v. Hagan, 306 F.Supp. 620 (D.Maryland 1969).

Of course in *Newton* the defendant presented the opposite side of the argument from that proffered by the appellants in this case. However, the deci-

sion certainly supports our view that a crime is not completed until the false document, in *Newton* a tax return, here a form required by the immigration laws, is actually used by the participants in the criminal enterprise by filing it with the Internal Revenue Service or, as here, with the Immigration and Naturalization Service. The crime is begun in one district, and venue may be proper there, but it is completed in another district where venue most definitely lies. We are not required to decide if venue would have been proper in Massachusetts.

Appellants place great reliance on the Supreme Court's decision in Travis v. United States, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961). There the Court refused to permit the defendant to be tried in Colorado where the allegedly false statement was made, but rather limited venue to the District of Columbia where the affidavit was filed. The statute in *Travis* made it unlawful to issue a false statement "in any matter within the jurisdiction of any department or agency of the United States" and a crime was not committed until the false statement was within the jurisdiction of the government. The appellants seize upon the absence of a comparable provision in 18 U.S.C., Section 1015(d) to argue that the crime is completed once the false acknowledgment is made and filing of the document is not relevant. As explained above, we simply do not agree with that contention. Rather we read the words "writing required or authorized by the laws relating to immigration" to mean that the defendant or his accomplice must use the allegedly false writing in a manner authorized by the immigration laws. Those laws and regulations require the document to be filed in Buffalo, New York. To accept appellants' interpretation of 18 U.S.C., Section 1015(d) would be to give the statute a meaning quite inconsistent with the rationale of *Travis*.

We hold that the filing of the petitions in Buffalo is an essential element of the crime cognizable under 18 U.S.C., Section 1015(d), and, thus, venue in the Western District of New York was proper both as a matter of statutory interpretation and as a matter of constitutional law.

### The Miscellany of Mini Points

### I

### The Motion for a Mistrial

Prior to the trial appellants had made a motion to compel the prosecution to disclose any "inducements" offered to witnesses to testify for the government. They were advised there had been no such inducements. Just prior to Aurelio's testimony as a witness at the trial, however, in scrutinizing the 3500 material submitted by the prosecution, defense counsel thought they had found some indication that Aurelio had been promised immunity from prosecution if he testified for the government. So, before Aurelio gave any testimony and at the opening of court on the second day of the trial, defense counsel made a motion for a mistrial on the ground that whereas the prosecution had failed to furnish exculpatory evidence, the immigration files "were replete with evidence which would lead to the conclusion that certain witnesses for the government, namely, Aurelio Irenze, Giuseppe Irenze, Assunta Irenze, Anthony Liccione and Maria Liccione, were promised immunity from prosecution in exchange for their testimony to be offered in this case." In vain did the prosecutor insist that there had been no promise of immunity and offer to produce at a hearing or have available as witnesses, in case the defense chose to interrogate them, Michael R. Wolford, who was the Assistant United States Attorney for the Western District at the time appellants were indicted, and a Mr. Truesdale, an investigator from the Immigration and Naturalization Service, who was supposed to have indicated that some inducement had been offered to these witnesses. But no, counsel said it was too late, appellants had been deprived of the opportunity to make a full investigation of the matter.

The only thing they wanted was a mistrial.

■ Judge Burke thereupon directed the submission of affidavits and said he would take the matter under advisement. It turned out that there had never been any promise of immunity. Everyone connected with the case, including the jurors, knew that the Bithoneys had been indicted and the deportable aliens had not been indicted. This provided material for the cross-examination of Aurelio and the others and the cross-examiner made use of it. That these witnesses were in trouble and had a motive to help the government prosecute the Bithoneys needed no disclosure by the prosecution. We hold it was not an abuse of discretion to deny the motion for a mistrial.

II

*Rulings on Admissibility of Evidence*

We find nothing even remotely approximating impropriety in the mild remarks of the trial judge to defense counsel for wasting time.

■ From time to time, especially during the direct examination of Aurelio, in testifying to conversations over the telephone with the Bithoney office in Boston, Aurelio said he was talking to "Mr. Bithoney," meaning Samuel, then that he was not sure whether he was talking to the father or the son, although he asked for "Mr. Bithoney," or "Mr. Samuel Bithoney," sometimes in connection with person to person calls. There was a barrage of objections, but nothing was said about taking any of this evidence subject to connection on the conspiracy count, about which defense counsel said as little as possible. In one instance, that is especially relied upon as reversible error, Aurelio at first said he could not tell which of the two Bithoneys he was talking to, and then said he was talking to "Mr. Bithoney." Upon vigorous objection Judge Burke remarked: "The witness has got a right to change his mind." This is said to

be extremely prejudicial, especially as Judge Burke refused to strike his remark from the record. We find no error in these rulings. It was for the jury to evaluate the weight of this testimony in the light of their view of Aurelio's credibility. Moreover, Samuel testified that he recalled numerous telephone conversations with Aurelio, and emphasized the fact that Aurelio always called "collect," as the $2000 had been paid to cover "expenses" as well as part payment of the fee.

■ A similar question arose in connection with some testimony by Barbara concerning a long telephone conversation with Samuel, just before the whole family group appeared before the Immigration investigator whose suspicions had been aroused by Samuel's remark about the recent marriages of Aurelio and Giuseppe at the hearing before Special Inquiry Officer Taffett in Buffalo on July 6, 1970. Aurelio had testified that he called Samuel, that Samuel had given him a detailed description of the questions that would be asked by the investigator and the answers he and the rest should make. Aurelio also testified that he took the precaution of recording the entire conversation so those who were to be questioned could play the tape over again and again before they gave their testimony or answered the questions.

After they had all gone in and lied like troopers, they went to a restaurant for dinner. Barbara was dissatisfied. Things had not gone the way she had been told that "Mr. Bithoney" had predicted. Many of the questions he said would be asked had not been asked. She wanted to talk to "Mr. Bithoney" on the phone. There was the usual objection to her testimony about this telephone conversation. She said she and Aurelio went into a telephone booth at the restaurant and Aurelio called "Mr. Bithoney." While at first she insisted that "It was 'Mr. Bithoney'" and that "I said, 'Hello Mr. Bithoney.' And he said 'yes,'" it developed later that this was only because Aurelio had told her it was "Mr. Bithoney."

We can appraise the substance of these objections to Barbara's testimony when we look at the testimony of Samuel in his own defense, and this applies also to the objections to Aurelio's testimony about his conversations over the telephone with "Mr. Bithoney" and to the taping of the instructions concerning the questions to be asked and the answers to be given and to the erasing of what was on the tape after it had been played over in the car as the Irenzes were going to appear before the Immigration inspectors.

The dates are important. The hearing was scheduled for October 13, 1970. Samuel testified that on the evening of October 12, Aurelio called him at his home, that he had explained that the matter was serious, that Aurelio and the others must be sure to testify to nothing but the truth and he went on to explain what the questions were likely to be and what answers were to be made, on the assumption, of course, that they must be strictly true in every respect. Then, Samuel testified, that Barbara wanted to speak to him, that Aurelio put her on the phone, and, for several pages of the transcript he told her just what Aurelio had testified that Samuel told *him* and what had appeared on the tape before it was erased after the hearing. So, Samuel *did* speak over the telephone to Barbara and he said just what Aurelio testified Samuel had said to *him*. But, Samuel changed the date of the conversation with Barbara from the late afternoon of October 13, to October 12, the day before, and prior to the hearing. Of course, Samuel could not very well explain that Barbara complained to him *after* the hearing. What becomes of the objection to Barbara's testimony on the ground that it was not shown that she knew she was speaking with Samuel, except for having been told so by Aurelio? And what is all the fuss about the tape and the injustice of permitting Aurelio to testify to the instructions given

by Samuel without producing the tape as originally recorded? We can find no error here.

### III

#### *Prior Inconsistent Statements*

 There had been much interrogation of the boys and their wives before the trial. There was testimony before the Immigration authorities and testimony before the Grand Jury. There was in particular the language difficulty of Aurelio who thought he spoke and understood English better than he really did. For a time this led to confusion and a messy record when counsel questioned witnesses about their prior testimony for purposes of impeachment. Judge Burke concluded, very wisely we think, that in every such case the witnesses should be confronted with their prior testimony verbatim and then given an opportunity to make any explanations or emendations they wished to make. We cannot see how this prejudiced any party to the case. There is no infallible rule or formula to govern the proof of prior inconsistent statements. Fairness to the witness is a paramount consideration, also the avoidance of confusion that is always possible when counsel creeps up on the subject or masks his approach. These matters are peculiarly within the discretion of the trial judge. Here it was plain enough, and it was in fact an integral part of the government case, that the boys and their wives had made numerous false statements, under oath and otherwise, about the good faith of the marriages, whether and where the husbands and wives were living together and so on.

There are many more of these frivolous claims of allegedly prejudicial errors but we shall not pursue them. We have carefully considered each and every one of these claims of error but we find no merit in any of them.

Affirmed.