**UNITED STATES of America, Appellee,**

v.

**Jack L. CHESTNUT, Appellant.**

**No. 316, Docket 75–1268.**

United States Court of Appeals, Second Circuit.

Argued Oct. 7, 1975.

Decided March 8, 1976.

Eugene F. Bannigan, Asst. U. S. Atty., S. D. N. Y., Great Neck, N. Y. (Paul J. Curran, U. S. Atty., Robert Gold, John D. Gordan, III, Asst. U. S. Attys., S. D. N. Y., New York City, of counsel), for appellee.

Jack S. Nordby, Saint Paul, Minn. (Douglas W. Thomson, Thomson, Wylde & Nordby, John A. Cochrane, Cochrane & Bresnahan, Saint Paul, Minn., of counsel), for appellant.

Before WATERMAN, OAKES and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Jack L. Chestnut appeals from a judgment of conviction of causing another to accept and receive an illegal corporate campaign contribution in violation of 18 U.S.C. §§ 610, 2.[1] After a four day trial before Edward Weinfeld, *District Judge,* the jury returned a guilty verdict. On June 25, 1975, Chestnut was sentenced to four months in prison and fined $5,000.

Appellant Chestnut offers six arguments on this appeal: (1) that the language and circumstances of the indictment proved the prosecution to be ex post facto; (2) that the indictment failed to state an offense because the payment described was a lawful expenditure rather than a contribution; (3) that venue in the Southern District of New York was improper because every element of the questioned transaction except actual deposit of the checks occurred elsewhere; (4) that the evidence failed to prove beyond a reasonable doubt the willfulness element of the crime; (5) that allowing a government witness to offer an opinion as to the legality of a contribution was prejudicial error; (6), that, on its face and as applied, 18 U.S.C. § 610 was unconstitutionally

---

1. In 1970, the time of the offense charged, 18 U.S.C. § 610 provided, in pertinent part, as follows:

"It is unlawful for . . . any corporation . . . to make a contribution or expenditure in connection with any election at which . . . a Senator . . . [is] to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for . . .

[such office], or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section."

18 U.S.C. § 2(b) states:

"Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

vague and overbroad. Judge Weinfeld, thoroughly considering these contentions in his pretrial and post-trial opinions, *United States v. Chestnut*, 394 F.Supp. 581, 399 F.Supp. 1292 (S.D.N.Y.1975), concluded that they were without merit. We agree and affirm the judgment of conviction.

*The Facts:*

In mid-February, 1970, Jack L. Chestnut, a Minneapolis attorney, became manager of Hubert H. Humphrey's 1970 Senatorial campaign in Minnesota. At a meeting in that state, Chestnut sought the services of Campaign Planners, an entity created to handle the political advertising accounts of Lennen & Newell, Inc. ("L & N"), a now-defunct New York advertising agency. An agreement was reached several weeks later, after L & N mailed its written proposal to Chestnut. Payment was to be made to L & N in flat monthly fees which increased in size as the campaign progressed towards election day; *in toto* the Humphrey campaign planned to spend about $72,000 for L & N's services. Since L & N had no Minnesota offices, its representatives worked out of Chestnut's Minneapolis law office. Other campaign business was also conducted from the law firm's office, with Penny Miller, the law firm's office manager, and Jennifer Broome, secretary for the campaign, constituting the core of the campaign staff.

Associated Milk Producers, Inc. ("AMPI"), a cooperative organization of dairy farmers, collects from its members voluntary donations to a political fund, Trust Agricultural Political Education ("TAPE"), from which it lawfully can contribute to political campaigns. TAPE funds, totally segregated from AMPI funds, are dispensed from its own checking account. Representatives of AMPI had assured the Humphrey campaign of between $40,000 and $50,000 in contributions; Bob Lilly was the liaison between AMPI and the Humphrey campaign staff.

Lilly's testimony revealed the nature of AMPI's involvement in unlawful corporate political spending. After the 1968 presidential election, AMPI apparently became concerned about its standing with the new Republican administration. AMPI officials did not want the administration to be aware of contributions made to Democrats. Since TAPE's contributions had to be publicly reported, corporate officials decided to indirectly make donations by using corporate funds to reimburse AMPI employees who had made personal donations or by simply using corporate checks to make contributions.

With this background, we turn to the sequence of events which resulted in Chestnut's indictment. It appears that in the spring of 1970 AMPI's General Manager, Harold Nelson, asked Chestnut if there were any Humphrey campaign bills to be paid. The two men agreed that AMPI would pay $12,000 toward the Humphrey campaign's debt to L & N. Chestnut testified that it was his understanding that the contributions were to come from TAPE, AMPI's political arm. There was conflicting testimony as to how well financed the Humphrey forces were at this early stage of the campaign.

In accordance with Chestnut's instructions to bill AMPI, L & N sent one invoice charging AMPI $12,000 for "consulting fee[s] in Minnesota." In an episode never satisfactorally explained, Chestnut then called Lilly to inform him not to pay that invoice but to await a corrected bill which he, Chestnut, would forward; Chestnut confirmed these instructions by letter on May 7, 1970. Five days later AMPI received from Chestnut four L & N invoices, each in the amount of $3,000, made out to AMPI. Once again following Chestnut's written instructions, Lilly transmitted two AMPI checks to Chestnut's office; these checks clearly were drawn on the corporate account and payable to L & N. Although Chestnut's memory of subsequent events was unclear, he denied that he had ever seen the AMPI checks. Members of his office staff testified that, by their usual business procedures, they would have forwarded the checks to L & N without calling them to Chestnut's attention. Furthermore, the staff had been instructed that no

corporate checks would be accepted as contributions. The checks from AMPI to L & N were deposited in L & N's New York bank and formed the basis of Chestnut's indictment.

At trial the government, over defense counsel's objection, introduced evidence of other suspect events for the limited purpose of showing similar conduct relevant to Chestnut's awareness of wrongdoing, i. e., the "willfulness" element of the crime. The government elicited testimony from Lilly, who appeared under a grant of immunity, that three other campaign contributions had been made: Lilly's personal check in the amount of $10,000 prior to the L & N payments; a remittance by Lilly of $1,450 by personal check pursuant to Chestnut's request; and $12,500 in cash which Lilly delivered to Chestnut late in the campaign. In addition, Chestnut's law firm received $5,000 indirectly from AMPI for legal services. AMPI paid this money to a third party on its payroll as a consultant, who then transferred it to Chestnut; the corporation later denied that Chestnut was one of its lawyers.

The government also questioned Penny Miller, Chestnut's office manager, about her testimony before the Grand Jury. At Chestnut's trial, there was evidence presented that Chestnut, after receiving legal advice that such action would be proper, authorized his staff to destroy financial records from the 1970 campaign. In her first appearance before the Grand Jury, Mrs. Miller refused to answer questions about this action. After receiving a grant of immunity the next day, Mrs. Miller testified about a conversation with Chestnut concerning the Senate Watergate investigation, in which conversation Chestnut had said that there was nothing damaging in the financial records, that they, meaning the Watergate Committee, could do him no harm via the records, but that his staff should get rid of them anyway. On the witness stand at Chestnut's trial, Mrs. Miller testified that the records were destroyed prior to the convening of the Watergate Committee.

The government also introduced handwriting exemplars taken by the F.B.I. in 1974 to compare with other samples of Chestnut's signature; a handwriting expert testified that although the two sets of signatures had been written by Chestnut, they looked as though they had been written by different people.

Chestnut testified in his own behalf. He stated that his understanding throughout his interactions with Lilly had been that any campaign donations from AMPI were to come from TAPE. Furthermore, he denied that he had ever seen the L & N checks that AMPI had sent to his office. Seven character witnesses attested to Chestnut's reputation for truth and honesty. There was also testimony that, on at least one occasion, Chestnut had returned to its sender a check drawn on a corporate account.

## I. *The Indictment.*

Chestnut attacks the indictment on two grounds: that he was subjected to an ex post facto prosecution because the indictment was returned under the 1972 version of the statute[2] rather than the 1970 statute in force when the offense was allegedly committed, and that the indictment failed to charge an offense under the 1970 version

---

**2.** The 1970 version of § 610 contained no definition of the terms "contribution" and "expenditure." These terms were defined in a separate section, 18 U.S.C. § 591, as follows, in pertinent part:

"The term 'contribution' includes a gift, subscription, loan, advance, or deposit, of money, or anything of value . . . ."

"The term 'expenditure' includes the payment, distribution, loan, advance, deposit, or gift, of money, or anything of value . . . ."

In 1972 § 610 was amended to include, *inter alia*, a definition of "contribution or expenditure" as follows, in pertinent part:

"As used in this section, the phrase 'contribution or expenditure' shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or anything of value . . . ."

Amended February 7, 1972, Pub.L. 92–225, Title II, § 205, 86 Stat. 10.

The definitional section, § 591, was amended at the same time as to these terms. 86 Stat. 8.

of the statute. We find both arguments unpersuasive.

■ In support of his claim that the wrong law was presented to the Grand Jury, Chestnut emphasizes the incompleteness of the statutory citation in the indictment, the similarity in the language of the indictment to the language of the 1972 amendment, and the fact that a copy of the 1972 version of the statute was attached to a press release issued by the prosecution. An indictment is sufficient if it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 620 (1974). The court must look at the allegations pleaded in the indictment to determine whether an offense has been charged. *United States v. Hutcheson,* 312 U.S. 219, 229, 61 S.Ct. 463, 464, 85 L.Ed. 788, 791 (1941); *Paz Morales v. United States,* 278 F.2d 598, 599 (1 Cir. 1960); *United States v. Kolodny,* 149 F.2d 210, 211 (2 Cir. 1945).

■ The unexplained episode in which the 1972 statute was appended to the press release does not determine the validity of the indictment. Properly looking at the facts pleaded in the indictment itself, the district court correctly concluded that an offense under the 1970 statute had been charged. Any similarity to the language of the 1972 statute is inconsequential since, "[t]he allegations which spell out the payment by AMPI to L & N for the services it rendered to the Humphrey campaign merely describe the details whereby it is charged the defendant engaged in artifice or subterfuge to conceal the receipt of the contribution." 394 F.Supp. at 585. Indeed, in *Pipefitters Local No. 562 v. United States,* 407 U.S. 385, 399, 92 S.Ct. 2247, 2256, 33 L.Ed.2d 11, 21 (1972), the Supreme Court explicitly

held that, with one exception not relevant to the instant case, the 1972 amendments made no substantive changes in the statute but "merely codifie[d] prior law." We thus conclude that Chestnut's argument that the events described in the indictment could be illegal only under the amended version of § 610 is without merit. The failure to cite properly the statute charged in the indictment would be ground for dismissal only if Chestnut had been misled to his prejudice. Rule 7(c), Fed.R.Crim.P.; *United States v. Calabro,* 467 F.2d 973, 981 (2 Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); *United States v. Rivera,* 513 F.2d 519, 533 n. 21 (2 Cir. 1975). Here the non-conformity merely consisted of omission of the definitional section's number and the notation that the statute had been amended. It is inconceivable that such omissions could have misled Chestnut as to the nature of the charges against him.[3] Furthermore, any doubts that Chestnut might have entertained as to which version of the statute formed the basis of his indictment should have been resolved by the district court's pretrial ruling on this very issue.

■ Chestnut also contends that the payment by AMPI to L & N was really an "expenditure" rather than a "contribution," as charged in the indictment, because expenditures are indirect payments while contributions include only gifts or direct payments; he then reasons that since § 610 did not make it a crime to receive an expenditure, the indictment failed to charge an offense. Even applying Chestnut's own analytic framework to the facts of this case, we find that AMPI's checks to L & N constituted a contribution to the Humphrey campaign.

The touchstone of Chestnut's argument is that AMPI's checks to L & N represented an expenditure by the corporation. In 1970 the statutory definition of a contribution

---

**3.** Compare *United States v. Beard,* 436 F.2d 1084 (5 Cir. 1971), where the government, after trial had begun, attempted to substitute a totally different and unrelated statute for that charged in the indictment. Such a substitution was, of course, held to be constitutionally impermissible.

included "a gift, subscription, loan, advance, or deposit, of money, or anything of value . . . ." Since AMPI had incurred no debt of its own to L & N because L & N had performed no services for AMPI, we agree with the district court that "picking up another's obligation—here a Humphrey campaign debt to L & N—is a gift of money, in short, a contribution to the Humphrey campaign." 394 F.Supp. at 586. It was only because Chestnut directed AMPI to pay some of the Humphrey campaign obligations due L & N that any transaction occurred between the two. Even though AMPI issued checks payable to L & N rather than the campaign committee itself, the corporation was making a contribution to the Humphrey campaign.

The Supreme Court's extensive discussion of § 610 in *United States v. Auto. Workers,* 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957), fully supports this conclusion. In that case, which concerned an "expenditure" violation, the Court concluded that the indictment charged an offense where a union used monies from its general treasury to pay for commercial television broadcasts sponsored by the union. The Court emphasized that Congress had added the prohibition of "expenditures" to § 610 to cover a union's distribution of its funds to state its own position to the world. 352 U.S. at 585, 77 S.Ct. at 538, 1 L.Ed.2d at 574. These "expenditures," however, resulted from obligations incurred by the union or corporation in presenting *its* views. "Contributions," then, must encompass "gifts . . or anything of value" made to the candidate or his campaign organization to assist the candidate in presenting his message to the public. In the instant case, AMPI incurred no obligations of its own to L & N. Rather, in lieu of giving money directly to the campaign organization, AMPI discharged obligations incurred by the campaign organization in promoting its candidate to the public, thus making a contribution.

---

**4.** Rule 18, Fed.R.Crim.P., implements these constitutional commands by providing that prosecution shall occur in a district in which

## II. *Venue.*

Chestnut next asserts, as he did in the district court, that trial in New York, rather than in Minnesota, was constitutionally impermissible because every element of the transaction, except the actual deposit of the checks, occurred outside New York.

■ It is clear that "[q]uestions of venue in criminal cases . . . are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed." *United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236, 239 (1944). The Constitution requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . . ." Art. III, § 2, cl. 3. The Sixth Amendment further guarantees trial "by an impartial jury of the State and district wherein the crime shall have been committed . . . ."[4] In *Platt v. Minnesota Mining Co.,* 376 U.S. 240, 245, 84 S.Ct. 769, 772, 11 L.Ed.2d 674, 679 (1964), a unanimous Supreme Court rejected "the erroneous holding of the Court of Appeals that criminal defendants have a constitutionally based right to a trial in their home districts." It thus appears settled that proper venue in a criminal case is determined by the locus of the offense. *United States v. Cores,* 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873–875 (1958); *United States v. Anderson,* 328 U.S. 699, 704–05, 66 S.Ct. 1213, 1216–1217, 90 L.Ed. 1529, 1532–1533 (1946). *See also* C. Wright, 1 Federal Practice and Procedure, § 301 at 581–582 (1975).

■ In determining proper venue then, the district court must ascertain both the nature of the offense and the location of the acts constituting it. *United States v. Anderson, supra,* 328 U.S. at 703, 66 S.Ct. at 1216, 90 L.Ed. at 1532; *United States v. Cores, supra,* 356 U.S. at 408, 78 S.Ct. at 877, 2 L.Ed.2d at 876. One helpful technique has been to study the key verbs which

the offense was committed, except as otherwise permitted by statute or the Criminal Rules.

define the criminal offense in the statute. *United States v. Slutsky,* 487 F.2d 832, 839 (2 Cir.), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1973); *United States v. Bithoney,* 472 F.2d 16, 23 (2 Cir.), *cert. denied,* 412 U.S. 938, 93 S.Ct. 2771, 37 L.Ed.2d 397 (1973). The defendant in the instant case was charged with violating 18 U.S.C. §§ 610 and 2 by willfully causing L & N to receive an unlawful corporate contribution on behalf of the Humphrey campaign. Chestnut first argues that the offense, if any, consisted of his actions in Minnesota, *i. e.,* causing the unlawful contribution, rather than causing L & N's receipt of the checks in New York. Clearly the substantive offense charged here is the receiving and accepting of an unlawful contribution. The causation aspect of the charge, derived from § 2, makes punishable as a principal one who willfully causes another to commit an offense. Since § 2 itself does not define a crime, *United States v. Gerhart,* 275 F.Supp. 443, 455 (S.D.W.Va. 1967), Chestnut's argument must fail. *See also United States v. Bozza,* 365 F.2d 206, 222 (2 Cir. 1966); *United States v. Campbell,* 426 F.2d 547, 553 (2 Cir. 1970). The constitutional standards for venue concern the locality of the substantive offense rather than the location of the offender at the time of the offense. *Armour Packing Co. v. United States,* 209 U.S. 56, 76, 28 S.Ct. 428, 433, 52 L.Ed. 681, 692 (1908); *see also Travis v. United States,* 364 U.S. 631, 634, 81 S.Ct. 358, 360, 5 L.Ed.2d 340, 343 (1961).

The Court must next decide "when the defendant's actions have progressed to the point where a court can confidently conclude that a crime has been committed." *United States v. Bithoney, supra,* 472 F.2d at 23. We conclude that venue in the Southern District was constitutionally proper because the deposit of the checks in New York, where the principal offices and officers of L & N were located, constituted the ultimate essential element of the offense of accepting and receiving an unlawful contribution.[5]

Prior cases have held that when a check is used to make a forbidden payment, venue is proper where the check is deposited. In *Burton v. United States,* 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905), the defendant, a United States Senator, was convicted in Missouri of receiving payment for services rendered in a proceeding in which the United States was a party. Checks for these services were mailed from St. Louis to the defendant in Washington. The Court held that the deposit of the checks in Washington constituted the receiving of payment that was forbidden by the statute; thus the crime occurred in Washington and venue in Missouri was improper.[6] Since the Court in the *Burton* case discussed at length the niceties of banking law in analyzing where payment of the check occurred,[7] it is at least clear that the place of *delivery* of a

---

**5.** Chestnut argues that the offense in question here was not a continuing offense which might be prosecuted in more than one district under 18 U.S.C. § 3237(a). In essence he claims that venue in this case was proper only in Minnesota. Since we have concluded that venue in New York was constitutionally permissible we need not consider whether the offense defined in § 610 is a continuing offense which also might have been prosecuted in Minnesota.

**6.** Another trial was held which culminated in a second Supreme Court opinion, *Burton v. United States,* 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057 (1906). In this later case the Court discussed venue only as it related to a new count in the indictment which charged Burton with agreeing to receive compensation. The Court upheld the jury's finding that an unlawful agreement occurred in Missouri.

**7.** The Court found that under the District of Columbia banking laws, the deposit of checks and the drawing against them by customers created a relationship of debtor and creditor, and the bank became the absolute owner of the check rather than the customer's agent for collection; this status was not affected by the bank's right to proceed against the customer if the checks were not paid. 196 U.S. at 297, 25 S.Ct. at 245, 49 L.Ed. at 486. New York's banking law appears to be in accord. *See, e. g., Menkes Feuer, Inc. v. People's Bank,* 43 N.Y.S.2d 32, 35 (Sup.Ct.1943), aff'd, 268 App. Div. 809 (3d Dept. 1944), 48 N.Y.S.2d 593, *lv. to app. denied,* 268 App.Div. 836, 50 N.Y.S.2d 463 (3d Dept. 1944).

check does not determine venue.[8] *United States v. Lotsch,* 102 F.2d 35, 36 (2 Cir.), *cert. denied,* 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939); *see also United States v. Johnson,* 337 F.2d 180, 193 (4 Cir. 1964), *aff'd,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). Consequently, it is not crucial to determine whether the checks involved in the instant case were delivered to L & N in Minnesota or New York.[9] Until the checks were deposited, the campaign debt was not discharged and no unlawful contribution had been received.

Finally, in *United States v. McMaster,* 343 F.2d 176, 181 (6 Cir.), *cert. denied,* 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.2d 65 (1965), where a donee was prosecuted for receiving a payment in violation of the Labor Management Relations Act, the court held that the deposit of corporate checks in a bank account in Detroit was sufficient, for purposes of venue, to establish payment in the Eastern District of Michigan. We therefore concur in the district court's conclusion that the offense occurred when AMPI's corporate checks were deposited in L & N's New York City bank account, thus discharging a debt owed by the Humphrey campaign. Venue in the Southern District of New York was proper.

### III. *Sufficiency of the Evidence.*

Chestnut also claims that the government failed to prove beyond a reasonable doubt that he saw the checks in question or knew that they were drawn on a corporate account. He therefore concludes that the government did not make the requisite showing of willfulness, an essential element of the offense charged. To buttress this argument, Chestnut cites his lack of motive for accepting corporate funds, evidence that

he had once returned such a check, and office procedures which would have resulted in his staff automatically forwarding the checks to L & N.

Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942), this Court will sustain a verdict where "a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Freeman,* 498 F.2d 569, 571 (2 Cir. 1974); *see also United States v. Taylor,* 464 F.2d 240, 243 (2 Cir. 1972). Recognizing the inherent difficulty in establishing a willful violation of the law by direct evidence, the Supreme Court has held that willfulness may be inferred from the "handling of one's affairs to avoid making the records usual in transactions . . . and . . . [from] conduct, the likely effect of which would be to mislead or to conceal." *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418, 423 (1943). Inferences of willfulness by juries have been upheld where, for example, extremely unusual circumstances were involved in a course of conduct and the defendant's explanation was implausible. *See United States v. De Garces,* 518 F.2d 1156, 1160 (2 Cir. 1975); *United States v. LaFroscia,* 485 F.2d 457 (2 Cir. 1973). The absence of proof of motivation is not fatal to the government's case where there is sufficient evidence of criminal intent. *United States v. Simon,* 425 F.2d 796, 809 (2 Cir. 1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970).

At trial the government adduced evidence that Chestnut devised and actively participated in the indirect procedures by which the Humphrey campaign would bene-

---

**8.** Senator Burton clearly received the check in Washington. Therefore, if the place of receipt was the determinative factor, the Court easily could have resolved the venue question without considering banking law.

**9.** Additionally there can be little question that the intent of the parties throughout this transaction was to transfer funds to L & N, located in New York. *See, United States v. Grossman,* 400 F.2d 951, 954 (4 Cir.), *cert. denied,* 393 U.S.

982, 89 S.Ct. 453, 21 L.Ed.2d 443 (1968), where, in an antikickback case, the court held that the payment proscribed was made in the state and district of indictment where the intention of the parties was to vest ownership of corporate stock in a donee at a time when he was domiciled and physically present in such state even though the certificates were delivered to the donee's mother in another state.

fit from AMPI's largesse. The evidence, as succinctly summarized by the district court, showed that Chestnut was deeply involved in accomplishing payment by a particular format:

> "It was the defendant who directed both Lennen & Newell, Inc. and Bob Lilly . . . to carry out the procedures whereby the advertising agency, which had rendered services to the Humphrey campaign, not to AMPI, would prepare invoices to be made out to AMPI and for AMPI to pay those invoices. It was the defendant who instructed Lilly not to pay the initial invoices because they were not in proper form, but to await corrected bills. It was the defendant who sent a letter to Lilly to have AMPI pay the enclosed four corrected invoices . . , instructing him to forward checks made payable to Lennen & Newell to him, the defendant, at his office in Minneapolis . . . ." 399 F.Supp. at 1294.

A jury could conclude that this manner of payment of campaign debts, whereby L & N billed AMPI for "consulting fee[s] in Minnesota" and AMPI issued checks payable to L & N, was intended to avoid making the usual records, with the likely effect of concealment of the transaction. The defense presented no cogent explanation as to why contributions were made in this manner. Given this elaborately indirect plan for making a political contribution and Chestnut's active role in insuring its effectiveness, we find that a reasonable mind could have inferred willfulness beyond a reasonable doubt.

IV. *Admissibility of "Similar Act" Evidence.*

Chestnut asserts that the trial court committed prejudicial error by allowing Bob Lilly to testify about three other contributions made to the Humphrey campaign. More specifically, Chestnut argues that this evidence falls outside this Circuit's inclusory rule because the other acts were not similar to the offense charged and thus went to show only Chestnut's criminal character. Chestnut also urges that the district court erred in permitting Lilly to express his opinion that these contributions violated 18 U.S.C. § 608's $5,000 limitation on donations.[10] Finally, Chestnut claims that since these other contributions were in fact lawful under § 608, error was committed when the court below refused to instruct the jury on this statute.

Turning first to Chestnut's argument that the evidence of other contributions was not admissible, it is settled in this Circuit that evidence of other offenses is admissible if "it is relevant for some purpose other than merely to show a defendant's criminal character, provided that its potential for prejudicing the defendant does not outweigh its probative value." *United States v. Papadakis*, 510 F.2d 287, 294 (2 Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *see also, United States v. Gerry*, 515 F.2d 130, 141 (2 Cir. 1975). Such evidence has been admitted for the purposes of showing willfulness; its probative value, determined by the trial court, is dependent on "the existence of a close parallel between the crime charged and the acts shown." *United States v. Leonard*, 524 F.2d 1076, 1091 (2 Cir. 1975); *see also United States v. Santiago*, 528 F.2d 1130, 1134 (2 Cir. 1976).

Lilly testified that he remitted three other payments to the Humphrey campaign, two personal checks to the Minnesota Democratic Campaign Committee of $10,000 and $1,450, made out pursuant to Chestnut's instructions and mailed to him, and $12,500

---

**10.** In 1970, 18 U.S.C. § 608 provided in pertinent part:

> "(a) Whoever, directly or indirectly, makes contributions in an aggregate amount in excess of $5,000 during any calendar year, or in connection with any . . . election, to or on behalf of any candidate for an elective Federal office . . . or to or on behalf of any committee or other organization engaged in furthering, advancing, or advocating the . . . election of any candidate . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both." "This subsection shall not apply to contributions made to or by a State or local committee or other State or local organization . . . ."

in cash personally delivered by Lilly to Chestnut at his law offices. Judge Weinfeld admitted this testimony with a limiting instruction to the jury that its relevance was confined solely to the issue of willfulness or intent; the district court repeated this restriction in its charge to the jury.

■ Given the trial court's cautionary instructions, we cannot find that admission of this evidence was reversible error. The "similar acts" occurred in close temporal proximity and were closely related in both subject matter and manner to the crime charged in the indictment. It was well within the trial court's discretion to determine that the course of conduct in which Chestnut engaged with regard to the three contributions was probative of his knowledge and intent as to the transactions involving L & N, and that admission of this evidence for that limited purpose was not unduly prejudicial. *United States v. Harvey,* 526 F.2d 529, 536 (2 Cir. 1975).

■ Chestnut also argues that error occurred in allowing Lilly to testify that, in his opinion, the two checks and the cash donation violated § 608's $5,000 limitation on contributions.[11] We disagree. The cases cited by Chestnut are not apposite to the instant situation. In *Huff v. United States,* 273 F.2d 56 (5 Cir. 1959), error was found in permitting a customs inspector with 28 years of experience to testify as to his interpretation of the customs law. The Court of Appeals for the Fifth Circuit held that his highly prejudicial testimony was impermissible because, in essence, it infringed upon the court's duty to charge the jury as to the applicable law. Similarly, in *United States v. Phillips,* 478 F.2d 743 (5 Cir. 1973), that same court found error in allowing a postal inspector to testify on a question of law or a mixed question of law and fact.

In the instant case, Lilly's status was not that of a government official but an admitted wrongdoer testifying under a grant of immunity. He was thoroughly cross-examined by defense counsel, during which his lack of knowledge about § 608's exemption for state campaign organizations was revealed. *Cf. United States v. Gottlieb,* 493 F.2d 987, 992 (2 Cir. 1974). Furthermore, the defense presented its own witnesses to testify that the contributions to the state committee were lawful under § 608. Although it would have been preferable for the government to refrain from soliciting Lilly's interpretation of the law, Chestnut suffered no prejudice therefrom. What was damaging was the properly admitted evidence that a series of other transactions had occurred from which Chestnut's willfulness could be inferred, not Lilly's opinion about the legality of the transactions themselves. We similarly reject Chestnut's argument that the district court erred in refusing to instruct the jury on § 608. Judge Weinfeld's charge to the jury covered all the essential elements of the offense for which Chestnut was being tried; it further emphasized that Lilly's testimony was to be considered only in relation to the question of Chestnut's knowledge and intent at the time of the offense charged. See *United States v. Hoffman,* 415 F.2d 14, 20 (7 Cir.), *cert. denied,* 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969).

## V. Constitutional Claims.

■ Chestnut argues that §§ 591 and 610 are unconstitutionally vague and overbroad. Judge Weinfeld, devoting a substantial portion of his pre-trial opinion to a thorough consideration of these identical arguments, rejected Chestnut's claims. 394 F.Supp. at 587–591. Since we agree with both his reasoning and conclusions, we find no need to amplify further the district

---

11. The government claims that Chestnut cannot now argue this point because he offered no objection below. *United States v. Indiviglio,* 352 F.2d 276 (2 Cir. 1965), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). However, a careful review of the trial transcript reveals that during the government's examination of Lilly about the use of TAPE funds, defense counsel specifically objected to inquiry about § 608's $5,000 limitation because a "legal conclusion" was being sought from Lilly. This objection was sufficient to preserve this point for appeal.

court's comprehensive analysis of these issues.[12]

Judgment of conviction affirmed.

---

12. Generally, the district court held that the 1970 version of the statute conveyed, with a reasonable degree of certainty, fair warning of what is or is not prohibited; furthermore, even if the outermost boundaries of the statute were imprecise, Chestnut's conduct fell within the "hard core" of the statute's proscriptions. Assuming *arguendo* that Chestnut had standing to challenge the breadth of the statute, the trial court found that the statute met the "least drastic means test" by prohibiting only contributions or expenditures from certain sources. The court below concluded that since conduct and not just speech was regulated, any overbreadth was not substantial in light of the government's legitimate interests in preserving the integrity of the electoral process and in preventing corporations and unions from using general funds for political purposes without the consent of stockholders or union members. *See also United States v. Boyle,* 157 U.S.App. D.C. 166, 482 F.2d 755, 763, *cert. denied,* 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973) (constitutionality of § 610 as to unions upheld). Nothing in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, 44 U.S.L.W. 4127 (1976), is to the contrary. *See also* Developments in the Law—Elections, 88 Harv.L.Rev. 1111, 1263 n. 169 (1975).