**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Timothy COFIELD, Defendant–Appellant.**

**No. 92–5722.**

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1993.

Decided Nov. 18, 1993.

As Amended Jan. 5, 1994.

Certiorari Denied Feb. 22, 1994.

See 114 S.Ct. 1125.

Julie Marie Strandlie, Passarelli & Brand, McLean, VA, argued (Kenneth N. Brand, on brief), for defendant-appellant.

Sarah Margaret Mortenson, Sp. Asst. U.S. Atty., Alexandria, VA, argued (Richard Cullen, U.S. Atty., on brief), for plaintiff-appellee.

Before LUTTIG, Circuit Judge, SPROUSE, Senior Circuit Judge, and KISER, Chief United States District Judge for the Western District of Virginia, sitting by designation.

## OPINION

SPROUSE, Senior Circuit Judge:

Timothy Cofield appeals his conviction for aiding and abetting the retaliation against a witness and retaliation against a witness in violation of 18 U.S.C. §§ 2 and 1513(a)(1). The primary issue on appeal concerns the proper venue under 18 U.S.C. § 1513, enacted under the Victim and Witness Protection Act of 1982. The district court held that venue was proper in the Eastern District of Virginia, the place of the underlying judicial proceeding. We agree. Likewise, we find no error in the district court's denial of Cofield's motion to sever nor in its denial of his motion for acquittal based on his contention of insufficient evidence, and affirm.

I

A federal jury in the Eastern District of Virginia convicted Timothy Cofield for aiding and abetting the retaliation against a witness and retaliating against a witness in violation of 18 U.S.C. §§ 2 and 1513(a)(1). Although the participants in the fight that led to Cofield's conviction have different versions of his motivation, there is no question the brawl occurred in the District of Columbia.

Sheila Wormley was the main prosecution witness in the case of *United States v. Kenny*, Crim. No. 91–347 (E.D.Va.1991). At Reverend Kenny's trial, Wormley testified that Kenny attempted to induce her to present false testimony to the grand jury.[1] Before she testified, Wormley had worked at Reverend Kenny's thrift store. During Reverend Kenny's trial, however, the judge issued a restraining order barring Wormley from the thrift shop and its surrounding areas. The district court in the Eastern District of Virginia convicted Reverend Kenny for obstruction of justice in violation of 18 U.S.C.

---

1. Reverend Kenny told Wormley he would pay her $175 to make a false representation to the grand jury regarding his acceptance of two traveler's checks that were stolen from an FBI agent. *Kenny*, 973 F.2d 339 at 340–41.

§ 1503, *Kenny,* Crim. No. 91–347 (E.D.Va. 1991), and we affirmed, *United States v. Kenny,* 973 F.2d 339, 345 (4th Cir.1992).

In the early afternoon on February 19, 1992, a little over a month after Reverend Kenny's conviction, Wormley left her volunteer tutoring position at Martha's Table in northwest Washington, D.C. with her two children and a friend's child. She walked down the street to ask a friend, Murphy Williams (a.k.a. Mr. Bill), for a ride home. She found Mr. Bill standing in front of Reverend Kenny's thrift store.

While Wormley was talking with Mr. Bill, Cofield and his girlfriend Deborah Kenny, along with a friend, Duane Wedge, drove up to the front of the thrift store and exited their car. At that time, Cofield and Deborah Kenny, the daughter of Reverend Kenny, had been involved in a two-year relationship. Deborah Kenny walked from the car toward Wormley and Mr. Bill. The parties dispute who initiated the ensuing argument. According to Wormley's testimony at trial, Deborah Kenny interrupted their conversation and said to Mr. Bill, "You can talk to that bitch somewhere else after what she did to my father." Deborah Kenny, however, testified that she stated to Mr. Bill, "Would you please move from my store, get the people from out [sic] front of my store." Under both versions, Wormley responded by swearing at Deborah Kenny, and Deborah Kenny cursed back. After the two had argued for about five minutes, Deborah Kenny drew back to hit Wormley. Wormley preempted the strike and hit Deborah Kenny. Around this time, Cofield got involved in the brawl. Cofield hit Wormley, knocked her to the ground, dragged her against a tree, and kicked her. During the fight, Cofield kept saying "this is my wife," referring to Deborah Kenny. Wormley, at some time during the conflict, pulled out a can of mace and sprayed Deborah Kenny.

Jacob Kisther, an off-duty District of Columbia police officer, observed Cofield beating Wormley and intervened. Although Kisther did not see the beginning of the confrontation, after the fight, he overheard Deborah Kenny state: "This was all in reference to the case you testified in before against Pops." When Deborah Kenny made this statement, Cofield was in the back of Kisther's vehicle, beyond hearing range. Following the confrontation, an ambulance transported Wormley to Howard University Hospital where she was treated for minor injuries. There is no indication from the record that Deborah Kenny or Cofield were injured.

On April 19, 1992, a federal grand jury indicted Timothy Cofield and Deborah Kenny in the Eastern District of Virginia for conspiracy in violation of 18 U.S.C. § 371; aiding and abetting the obstruction of justice and obstruction of justice in violation of 18 U.S.C. §§ 2 and 1503; aiding and abetting the retaliation of a witness and retaliation of a witness in violation of 18 U.S.C. §§ 2 and 1513(a)(1); and aiding and abetting tampering with a witness and tampering with a witness in violation of 18 U.S.C. §§ 2 and 1512(b)(1). Approximately two months later, on the government's motion, the district court dismissed the conspiracy count. On July 1, 1992, Cofield and Kenny were tried jointly.

Prior to trial, Cofield filed several motions, including a motion to sever his trial from Deborah Kenny's and a motion to transfer venue to the District of Columbia. On June 19, 1992, the court denied both motions. At the conclusion of the government's evidence, Cofield moved for a judgment of acquittal, which the district court denied. The jury found him guilty of aiding and abetting the retaliation against a witness and retaliating against a witness in violation of 18 U.S.C. §§ 2 and 1513(a)(1), but found him not guilty on all other counts. On September 11, 1992, the district court sentenced him to seventy months' imprisonment followed by a two-year supervised release term and imposed a $50 special assessment. Cofield appeals his conviction, challenging the court's denial of his motions to transfer venue, for severance, and for judgment of acquittal.

## II. VENUE

Article III, Section 2 of United States Constitution guarantees a defendant a trial in the state where the crimes were committed.

U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment commands that all criminal defendants have a right to a trial in "the State and district wherein the crime shall have been committed." U.S. Const. amend. VI; *see Travis v. United States*, 364 U.S. 631, 633, 81 S.Ct. 358, 360, 5 L.Ed.2d 340 (1961). Federal Rule of Criminal Procedure 18, implementing these constitutional requirements, provides that "except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Fed.R.Crim.P. 18; *see United States v. Kibler*, 667 F.2d 452, 454 (4th Cir.), *cert. denied*, 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982).

█ In many criminal statutes, Congress eliminates the problem of determining where "the offense [is] committed" by appending a venue provision. However, "where Congress is not explicit, 'the locus delicti must be determined from the nature of the crime alleged and the location of the acts or acts constituting it.'" *Travis*, 364 U.S. at 635, 81 S.Ct. at 361 (quoting *United States v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946)).

Cofield was convicted under 18 U.S.C. § 1513(a)(1), which has no venue provision. Section 1513 provides in part:

(a) Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—

(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding.

Cofield argues that this language directs venue to the District of Columbia, where the alleged assault occurred, and that the district court erred in denying his motion to transfer venue there. To support this proposition, he relies heavily on *United States v. Kibler*, 667

F.2d 452, 454 (4th Cir.1982). In *Kibler*, we were faced with the task of ascertaining the proper venue under 18 U.S.C. § 1503, another obstruction of justice statute. There, we looked to the verbs defining the proscribed act for direction in resolving the venue issue.[2] Employing this same analysis, Cofield points out correctly that the verbs in § 1513, the statute under which he was convicted, are "engages," "causes" (bodily injury), "damages," and "threatens" and argues that all of those verbs describe conduct that occurred in the District of Columbia.

The government, however, contends principally that § 1513 is part of the federal criminal law relating to obstruction of justice, that these statutes are derived from a common source: laws providing punishment for contempt of court. The purpose of these statutes, the government insists, is to protect the judicial process from hostile or corrupt actions. From this analysis, it concludes that since the judicial integrity of the district court in the Eastern District of Virginia was offended by Cofield's conduct, venue was proper in that district.

Cofield's argument that we have adopted the "verb test" as an interpretative aid is certainly correct. So, too, is the government's argument that in determining venue we have looked at the purpose of the statute as evidenced by its legislative history. In *Kibler*, we applied the "verb test" to § 1503 and reached a contrary result as to the venue location than that advocated by Cofield, i.e., we held that the locus of the crime under § 1503 was in the district where the judicial proceedings that the accused sought to affect was pending. *Id.* at 454. The *Kibler* holding, however, does not diminish the force of Cofield's argument that the verbs used in § 1513 direct venue to the district where the retaliatory acts occurred. In addition to finding guidance from the statutory verbs, however, *Kibler* relied on the legislative history of § 1513 to conclude that venue re-

---

**2.** The *Kibler* panel was faced with locating venue under 18 U.S.C. § 1503, then a comprehensive obstruction of justice section. It found that "an analysis of the verbs defining the offense [under § 1503] establishes that the situs of the crime is

the place of the judicial proceeding that the accused sought to thwart." *Kibler*, 667 F.2d at 454. *Kibler* went on to consider the legislative history of § 1503 and found that it supported the same conclusion. *Id.* at 454–55.

posed in the district of the protected court. *Kibler*, 667 F.2d at 454–55.

We are not only bound by the dual approach used in *Kibler*, but its logic is unassailable. *See United States v. Tedesco*, 635 F.2d 902, 905 (1st Cir.1980), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981). We have, in fact, indicated that a multiple approach under some circumstances may be proper. *See United States v. Billups*, 692 F.2d 320, 332 (4th Cir.1982), *cert. denied*, 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983). In *Billups*, we recognized that it was not always possible by the use of one analytical tool to discern the location of where a crime has been committed. *Id.* We noted that examination of verbs employed in the statute is not an exclusive method and "there are crimes where the situs is not so simple of definition." *Id.* Similarly, in *United States v. Reed*, 773 F.2d 477, 481 (2d Cir.1985), Judge Winter wrote that in evaluating the appropriate venue for crimes:

> [A] review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding.

*See also United States v. Chestnut*, 533 F.2d 40, 46–48 (2d Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976); *United States v. Bithoney*, 472 F.2d 16, 23–24 (2d Cir.), *cert. denied*, 412 U.S. 938, 93 S.Ct. 2771, 37 L.Ed.2d 397 (1973). Thus, although the "verb test" as an interpretative tool enjoys both the support of precedent from this circuit and the force of logic, its use to the exclusion of other interpretative guides would violate the overriding principle of *United States v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946), that we must consider "the nature of the crime alleged and the location of the act or acts constituting it."

The inherent difficulty of making the venue determination in the § 1513 inquiry that we now undertake is exacerbated because the two interpretative tools on which *Kibler* relied point us in opposite directions. Examining the verbs of the statutes would result in finding venue in the District of Columbia. "Engages," "causes," "damages," or "threatens," to the extent that they occurred, happened there. On the other hand, we are firmly persuaded by the legislative evolution of § 1513 that the congressional purpose in enacting the statute was to protect the integrity of the judicial system, here represented by the district court of the Eastern District of Virginia.

In *Kibler*, we acknowledged the legislative history of § 1503 recounted in other judicial opinions.[3] *Kibler*, 667 F.2d at 454–55. We noted that its legislative history "supports the conclusion that venue for a prosecution charging a violation of § 1503 lies in the district where the judicial proceeding that the accused sought to affect is pending." *Id.* Briefly stated, the legislative history of § 1503 began with the Act of March 2, 1831, 4 Stat. 487,[4] passed by Congress to curb the

---

3. *See United States v. Tedesco*, 635 F.2d 902, 905–06 (1st Cir.1980), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981); *United States v. O'Donnell*, 510 F.2d 1190, 1192–93 (6th Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *see also United States v. Essex*, 407 F.2d 214, 217 n. 6 (6th Cir.1969).

4. Section 1 of the 1831 Act provided
   [t]hat the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of said courts, or so near thereto as to obstruct the administration of justice, the misbehaviour of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree or command of the said courts.

   Section 2 provided
   [t]hat if any person or persons shall, corruptly, or by threats or force, endeavor to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall, corruptly, or by threats or force, obstruct, or impede, or endeavour to obstruct or impede, the due administration of justice therein, every person or

power of federal courts to summarily punish for contempt of court.[5] Section 1 of the Act provided for summary punishment for circumscribed acts of contempt committed in the presence of the court. Section 2 provided for punishment for offenses committed out of the presence of the court. Section 1 evolved into the present 18 U.S.C. § 401 "Power of Courts." Section 2 evolved into 18 U.S.C. § 1503. *See United States v. Essex*, 407 F.2d 214, 217 (6th Cir.1969); *infra* note 7.

In response to widespread witness intimidation and retaliation, Congress further expanded the protections available to witnesses and others in the federal judicial system by enacting the Victim and Witness Protection Act of 1982. *See* 128 Cong.Rec. S7424 (1982) (statement of Sen. Heinz). This Act amended § 1503 and added §§ 1512 and 1513.[6]

> persons, so offending shall be liable to prosecution therefor, by indictment, and shall, on conviction thereof, be punished, by fine not exceeding five hundred dollars, or by imprisonment not exceeding three months, or both, according to the nature and aggravation of the offence.

5. Judge Peck's nineteenth century impeachment controversy led to the enactment of the 1831 Act. That political and judicial drama has been widely discussed by both students and scholars so a full discussion is not warranted. A very brief summary, however, lends some understanding to our inquiry. Luke Lawless represented many land speculators who had purchased questionable land titles in the Missouri territory basing their title claims on mostly bogus grants from Spanish authorities. Judge Peck ruled against him in 1825. After Judge Peck's opinion was published, Lawless published a "Concise Statement of Some of the Principal Errors" in which he mocked and expounded upon Judge Peck's errors. After a bench trial, Judge Peck found Lawless guilty of contempt and sentenced him to one day imprisonment and suspended him from practice for eighteen months. As a result of Peck's action, Lawless presented to his friends in Congress a petition seeking Judge Peck's impeachment. Eventually, the House voted 123–49 to present Articles of Impeachment against him. In the Senate, Judge Peck was acquitted by a vote of 22 to 21. Walter Nelles & Carol W. King, *Contempt by Publication in the United States*, 28 Colum.L.Rev. 401, 426–30 (1928).

> Within twenty-four hours of the acquittal the House had instructed its Judiciary Committee to inquire into the expediency of defining, by statute, all offences which may be punishable as contempts of the courts of the United States. Nine days later Buchanan reported such a bill. It passed the House on February 28th. It

Victim Witness Protection Act of 1982, Pub.L. No. 97–291, 96 Stat. 1248. Prior to that time, the provisions relating both to intimidation of witnesses and retaliation against witnesses were contained in § 1503.[7] In 1988, Congress amended § 1512 by adding subsection (h) as a venue provision for §§ 1503 and 1512. Section 1512(h) states that

> [a] prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

Section 1512(h) thus provides specific alternative venues for §§ 1503 and 1512 but is silent as to § 1513.[8]

> passed the Senate with an amendment on March 2nd; on the same day the House amended the Senate amendment, the Senate concurred, and the law was approved by the President.

*Id.* at 430 (quotations omitted). The resulting 1831 Act, of course, recognized the historical authority of courts to punish for contempt but closely limited summary punishment and subjected "constructive" contempt to a full panoply of protections. *See supra* note 4.

6. The Act added, among other provisions, 18 U.S.C. § 1514, which authorized federal courts to issue orders protecting witnesses from harassment, and 18 U.S.C. § 1515, which is a definitional section. Victim Witness Protection Act of 1982, Pub.L. No. 97–291, 96 Stat. 1248.

7. Before the 1982 amendment, § 1503 provided punishment for

> [w]hoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States ... or injures any party or witness in his person or property on account of his attending or *having attended* such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying *or having testified* in any matter pending therein, ... or impedes or endeavors to influence, obstruct, or impede, the due administration of justice.

18 U.S.C. § 1503, *amended by* 18 U.S.C. § 1503 (1982) (emphasis added).

8. We are not impressed with Cofield's argument that by not including a reference to § 1513 in the 1988 amendment, Congress intended that the

In our view, the crimes described in §§ 1503, 1512, and 1513 are of the same genre. Their purpose is to protect the judicial process and the participants in the process. We held in *Kibler* that the legislative history supports the conclusion that venue under § 1503 "lies in the district where the judicial proceeding that the accused sought to affect is pending." *Kibler,* 667 F.2d at 455. When we decided *Kibler,* § 1503 proscribed not only witness intimidation but conduct amounting to retaliation against a witness. *See supra* note 7. We are of the view that the same legislative history that conclusively supported our venue finding relating to the pre–1982 § 1503 in *Kibler* applies with the same force to § 1513.

Contempt of court statutes, of course, exist to protect the integrity of the judicial process in the courts where the contemptuous conduct occurred. Obstruction of justice statutes track this same judicial purpose and policy. We thus discern no principled reason for applying these historical directions differently to discrete obstruction of justice statutes. Beyond the broad purpose of maintaining the integrity of the judicial process, the Victim and Witness Protection Act of 1982 sought to give greater protection to victims and witnesses—all active participants in the judicial process. *See* 128 Cong.Rec. 23399–400 (daily ed. Sept. 30, 1982) (statement of Rep. Hawkins). It may be that an act of retaliation is committed in a place and time distant from the judicial proceeding where the testimony was given. In that event, judicial resources where the act of retaliation took place might be more efficient to deter such conduct. In contrast, a retaliation could occur while a trial is still in progress, shortly after the trial, or while the court has a continuing involvement with the matters involved at trial. In any event, we are persuaded that historical concerns for the protection of judicial processes confluent with the principal purpose of the 1982 Act—protecting victims and witnesses, require a holding that the locus delicti of the crime of retaliating against a witness may be in the district where the judicial proceeding occurred and that venue in that location is proper.

Our conclusion by no means excludes the possibility that venue may also be proper in the District of Columbia where the retaliatory acts occurred. The Constitution does not limit venue for a crime to one exclusive district—it requires only that venue be determined from the nature of the crime and the location of the acts constituting it. *See United States v. Reed,* 773 F.2d 477, 480 (2d Cir.1985). However, we are not faced with the issue of alternative venue so leave that question for another day.

## III. SUFFICIENCY OF THE EVIDENCE AND MOTION FOR SEVERANCE

Cofield's two remaining contentions require little discussion. Cofield argues that there was insufficient evidence of his "intent to retaliate" against Wormley for her testimony against Reverend Kenny. We disagree. The jury's verdict, of course, must be upheld if "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The elements of an offense under 18 U.S.C. § 1513 are (1) knowing engagement in conduct (2) either causing, or threatening to cause, bodily injury to another person (3) with the intent to retaliate for, *inter alia,* the attendance or testimony of a witness at an official proceeding. Kenny made clear that her actions against Wormley were motivated by what the latter "did" to Reverend Kenny. Cofield was close by—close enough to enter the fray as soon as it began. The jury could well infer that he heard Kenny's remarks and his act of taking charge of her cause was evidence of his sharing her motivation.

As to Cofield's next argument that he should have been tried separately from Kenny, absent compelling reasons, persons

---

locus of the crime should be only in the district where the retaliatory actions took place. The countervailing argument is that if Congress intended to legislate a venue provision for § 1513, it could have easily added conclusive language in § 1512 or delineating language in § 1513.

indicted together should be tried together. *United States v. Clark*, 928 F.2d 639, 644 (4th Cir.1991). Whether to grant a severance under Rule 14 of the Federal Rules of Criminal Procedure is a matter within the discretion of the district court, and the denial of such a motion will be overturned only in the case of a clear abuse of discretion. *United States v. Odom*, 888 F.2d 1014, 1017 (4th Cir.1989), *cert. denied*, 498 U.S. 810, 111 S.Ct. 44, 112 L.Ed.2d 21 (1990). To prevail on appeal, a defendant "must overcome the burden imposed by a stringent standard of review." *United States v. Jamar*, 561 F.2d 1103, 1106 (4th Cir.1977). The trial in this case was short, the evidence was not complex, and the chronological nature of the evidence made it relatively simple for the jury to follow the evidence. There was no indication that it was confused or could have confused evidence presented against Kenny as evidence against Cofield.

In view of the above, the judgment of the district court is affirmed.

*AFFIRMED.*

LUTTIG, Circuit Judge, concurring in part and dissenting in part:

I concur fully in the majority's disposition of appellant's sufficiency of the evidence and severance claims. I must dissent, however, from its holding that venue can constitutionally lie in the Eastern District of Virginia. In my view, Article III and the Sixth Amendment mandate that appellant be tried in the District of Columbia. Accordingly, I would vacate appellant's conviction under 18 U.S.C. § 1513 and remand to the district court with instructions to dismiss the indictment.

I.

Article III requires that "the Trial of all Crimes ... shall be held in the State *where the said Crimes shall have been committed.*" U.S. Const. art. III, § 2, cl. 3 (emphasis added). Reinforcing this command, the Sixth Amendment directs that, "[i]n all crimi-

nal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district *wherein the crime shall have been committed....*" U.S. Const. amend. VI (emphasis added).

Cofield was convicted of, *inter alia*, retaliating against a witness in violation of 18 U.S.C. § 1513(a)(1).[1] The conduct for which he was convicted consisted of striking Sheila Wormley—who had been a witness in a then-completed judicial proceeding—knocking her to the ground and dragging her against a tree, all of which occurred in front of a thrift store in the District of Columbia. Thus, in the words of section 1513, exclusively within the geographical boundaries of the District of Columbia, Cofield "engage[d] in conduct" that "cause[d] bodily injury" with the "intent to retaliate against" a witness for attendance "at an official proceeding...." As the majority itself concedes, *Cofield undertook no conduct and committed no act, nor any portion of the offense,* in the Eastern District of Virginia. Under these circumstances, the plain language of both Article III and the Sixth Amendment dictates that constitutional venue lies only in the District of Columbia.

Notwithstanding that Cofield concededly committed his crime in the District of Columbia, the majority holds that venue lies also in the Eastern District of Virginia. The majority reaches this conclusion by reasoning that the overall purpose of section 1513 is the same as that underlying contempt of court statutes—to protect the integrity of the judicial system—and therefore that section 1513 venue should lie in the Eastern District of Virginia, where it would lie had Cofield been convicted of contempt. This "dual approach" for determining venue, *ante* at 416, under which a court must inquire not merely as to where the crime was committed but also as to the general purposes prompting the statutory proscription, is required, the majority believes, by the "overriding principle" of *United States v. Anderson*, 328 U.S. 699, 703,

---

1. Section 1513(a) punishes
   [w]hoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of

another person, or threatens to do so, with intent to retaliate against any person for—
   (1) the attendance of a witness or party at an official proceeding....

66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946). *Ante* at 417.

## II.

### A.

The majority's error, I believe, is its misreading of the Supreme Court's directive in *Anderson* to consider the "nature of the crime" in conducting the Sixth Amendment venue analysis. The majority reads this directive as requiring that effect be given to Congress' overall purpose in enacting a criminal provision even where, as here, Congress did not criminalize the particular conduct that its asserted purposes suggest might have been criminalized. Proceeding on this misreading, which was urged upon it by the government, the majority effectively reads into section 1513 the element of an effect on the administration of justice even though Congress did not in that section criminalize the affecting of the administration of justice. Unlike sections 1503 and 1512(c), for example,[2] section 1513 criminalizes conduct entire-ly without regard to its effect on either particular proceedings or the administration of justice as a whole. Compare *United States v. Cores*, 356 U.S. 405, 409, 78 S.Ct. 875, 878, 2 L.Ed.2d 873 (1958) ("remaining at the instant of expiration" satisfies but does not exhaust the definition of the crime). In other words, the "nature of the [section 1513] crime" is such that it is committed irrespective of any effect it might have had on the judicial process. Because the crime does not necessitate (even if it assumes) an effect on a judicial proceeding or the justice system, the fact that commission of its constituent acts might have affected the judicial process in another jurisdiction cannot support venue in that jurisdiction.[3]

The majority's misunderstanding of the phrase "nature of the crime" is understandable. The Supreme Court has never defined the phrase or actually applied it in the Sixth Amendment context in a way that provides any insight into its meaning. And the phrase is inherently ambiguous in the context of the Sixth Amendment venue analysis.[4] I believe,

---

2. Sections 1503 and 1512(c) provide as follows:

   **18 U.S.C. § 1503. Influencing of or injuring officer or juror generally**
   Whoever corruptly, or by threats or force, or by any threatening letter or communication, *endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States* ... or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him ... *or endeavors to influence, obstruct, or impede, the due administration of justice* ... shall be fined not more than $5,000.... (Emphasis added).
   **18 U.S.C. § 1512. Tampering with a witness, victim, or an informant**
   (c) Whoever intentionally harasses another person and thereby *hinders; delays, prevents, or dissuades any person from*—
   (1) *attending or testifying in an official proceeding*

   .      .      .      .      .

   shall be fined not more than $25,000.... (Emphasis added).

3. That Congress understood that the section 1513 offense is committed only where the defendant's retaliatory acts are perpetrated, and thus that prosecutions under the section are to be brought only in the district where those acts were actually committed, is evidenced by the fact that it did not include in section 1512(h) the section 1513 offense as one that could be prosecuted in the district of the proceeding sought to be affected. Pub.L. No. 100–690, Title VII, § 7029(a), 102 Stat. 4397, 4398. The government argues that no such inference can be drawn from section 1513's exclusion, because section 1512(h) was prompted by a specific concern regarding "a split in the circuits" over where obstruction of justice prosecutions under section 1503 could be brought. *Brief for the United States* at 14 (citing 134 Cong.Rec. S17369 (daily ed. November 10, 1988) (statement of Senator Biden)). This argument would have more force if section 1512(h) extended only to section 1503 offenses. However, it covers the section 1512 offenses as well, over which, as the government apparently recognizes, there was no circuit split at the time. *See United States v. Frederick*, 835 F.2d 1211, 1212–15 (7th Cir.), *cert. denied*, 486 U.S. 1013, 108 S.Ct. 1747, 100 L.Ed.2d 210 (1988). Thus, while the majority is "not impressed," *ante* at 418 n. 8, there is every reason to believe that the omission of the section 1513 offenses from those in section 1512(h) for which it intended broader venue was deliberate and deserving of consideration.

4. The phrase was imported into the Sixth Amendment jurisprudence seemingly without much forethought from what the *Anderson* Court recognized was a different context, *see* 328 U.S. at 703, 66 S.Ct. at 1216, in which its meaning and application were relatively clear and its use was of more obvious analytical value. *See United States v. Bowman*, 260 U.S. 94, 97, 43 S.Ct. 39, 40, 67 L.Ed. 149 (1922). In *Bowman*, the phrase

however, the Court intended by this phrase nothing more (or less) than an exhaustive inquiry into the precise conduct that Congress proscribed in the particular statute. This inquiry may legitimately include consideration of congressional purpose, but I do not believe, as does the majority, that venue can be predicated upon even undisputed purposes of the statute that were not actually given effect in the statutory text.

Construing the phrase as concerned exclusively with the conduct proscribed by the particular criminal statute, as I would, is more faithful both to the logic of the analysis suggested by the Sixth Amendment itself and to the Court's limited precedent on this question. The sole question in Sixth Amendment venue analysis is the geographic location of the crime; the Constitution requires trial in the jurisdiction *where* the crime was committed. *See, e.g., Anderson,* 328 U.S. at 704–05, 66 S.Ct. at 1216–17 ("The constitutional specification is geographic; and the geography prescribed is the district or districts within which the offense is committed.") (footnote omitted); *United States v. Cores,* 356 U.S. at 407, 78 S.Ct. at 877, 2 L.Ed.2d 873 (1958) ("The Constitution makes it clear that determination of proper venue in a criminal case requires determination of where the crime was committed.") (footnote omitted). To determine the geographic location of the crime in turn requires first, that the conduct or acts constituting the crime be identified and, second, that the location of the commission of those acts be ascertained. Because the standard adopted by the Court presumably parallels the simple logic of the Amendment, the most reasonable inference

is that when it instructed that venue be based upon "the nature of the crime alleged and the location of the act or acts constituting it," *Anderson,* 328 U.S. at 703, 66 S.Ct. at 1216, the Court intended by the phrase "nature of the crime" the conduct—the act or acts—constituting the offense.

Consistent with this logical inference, the Court without exception has invoked the phrase in its Sixth Amendment venue cases exclusively as a shorthand reference for an inquiry into the specific conduct or acts statutorily proscribed.[5] It first used the phrase in the constitutional venue context in *United States v. Anderson,* where it decided the proper venue for a prosecution for refusing to submit to induction into the Armed Forces in violation of Section 11 of the Selective Training and Service Act. 328 U.S. at 703, 66 S.Ct. at 1216. After reciting the "nature of the crime and location of the acts constituting it" standard, *id.,* it proceeded to examine the acts constituting the crime and the geographical location of their commission. As the Court concluded, "[Anderson's] refusal [to submit for induction] was his crime. It took place at Fort Lewis. The District Court [in Fort Lewis] accordingly had jurisdiction." *Id.* at 706, 66 S.Ct. at 1217.

In *Travis v. United States,* 364 U.S. 631, 635–37, 81 S.Ct. at 361–62 (1961), the Court addressed the question of venue for prosecution of the crime of filing a false statement with the National Labor Relations Board. Again acknowledging the need to examine the nature of the crime in order to determine where the crime was committed, the Court proceeded to examine exclusively the acts

was used in the context of determining whether Congress had conferred jurisdiction on the federal district courts to hear criminal prosecutions alleging a conspiracy to defraud the United States through false claims, where the alleged fraudulent acts occurred on the high seas. *Id.* Although the statute was silent as to its application to the high seas, the Court concluded from the very nature of the crime, *i.e.,* that it was likely to be committed on the high seas and in foreign ports, that Congress intended to extend the Act to the high seas and thus to confer jurisdiction on the federal courts. *Id.* at 97, 100–102, 43 S.Ct. at 40, 42. The analytical value of a generalized inquiry into a crime's "nature" when conducting the narrow Sixth Amendment inquiry into the precise conduct that constitutes the

crime and the location of the acts perpetrated by the particular defendant in question is not as readily apparent.

5. As a shorthand (as opposed to an analytical tool), the phrase arguably better admits of the inherent difficulty of determining for some offenses precisely what conduct or acts are encompassed within the statute's criminal proscription. *See, e.g., Anderson,* 328 U.S. at 705–06, 66 S.Ct. at 1217–18 (noting difficulties "where the crime consists merely in omitting to do something which is commanded to be done"); *United States v. Cores,* 356 U.S. 405, 78 S.Ct. 875, 2 L.Ed.2d 873 (whether "willfully remaining" constitutes a continuing crime).

proscribed by section 9(h) of the National Labor Relations Act, as amended. Closely scrutinizing "the words of the Act" and its "statutory design," 364 U.S. at 635–36, 81 S.Ct. at 361–62, the Court concluded that "the explicit provision" of section 9(h) penalizes "only the single act of having a false statement at a specified place," rather than the act of filing the statement. *Id.* at 637, 81 S.Ct. at 362. Because that "specified place" was the District of Columbia, where the false statement was actually placed on file, the Court held that the prosecution could only be brought there, and not in the district where the statement was executed and mailed. *Id.*

In its only other case employing the nature of the crime analysis, *United States v. Cores, supra,* the Court considered whether an alien's act of "willfully remain[ing] in the United States in excess of the number of days allowed," in violation of § 252(c) of the Immigration and Nationality Act, 66 Stat. 221, 8 U.S.C. § 1282(c), was a continuing crime that could be prosecuted wherever the accused was found. 356 U.S. 405, 78 S.Ct. 875. After stating the need to consider the nature of the crime to determine where it was committed, the Court reasoned that *"[t]he conduct proscribed* is the affirmative act of willfully remaining" and that "the crucial word 'remains' permits no connotation other than continuing presence." 356 U.S. at 408, 78 S.Ct. at 878 (emphasis added). Therefore, it concluded, the offense occurs wherever the accused continually remains. *Id.* at 409, 78 S.Ct. at 878.

Far from an invitation to give effect to a statute's general purpose, the "overriding principle" to be gleaned from these cases is that the nature of the crime inquiry is intended to be an exacting inquiry into the specific conduct constituting the offense, largely if not exclusively defined by the particular verbs written in a statute. There is no evidence whatsoever that the Court intended to confer through the phrase "nature of the crime" *carte blanche* on the courts to effectuate general congressional purpose distinct from the specific congressional intent evidenced in the statutory text.[6]

The Courts of Appeals have almost uniformly understood the phrase as only requiring inquiry into the specific conduct proscribed by the statute, as evidenced by the verbs that Congress employed. *See, e.g., United States v. Barsanti,* 943 F.2d 428, 434 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992); *United States v. Blecker,* 657 F.2d 629, 632 (4th Cir.1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982); *United States v. Brakke,* 934 F.2d 174, 176–77 (8th Cir.1991); *United States v. Ryan,* 894 F.2d 355, 360 (10th Cir.1990); *United States v. Griffin,* 814 F.2d 806, 810 (1st Cir.1987); *United States v. Chestnut,* 533 F.2d 40, 46–48 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976); *but see United States v. Billups,* 692 F.2d 320, 332 (4th Cir.1982), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983) (verb test not exclusive method); *United States v. Reed,* 773 F.2d 477, 481 (2d Cir.1985) ("substantial contacts" test). Indeed, this circuit so understood the phrase in *United States v. Kibler,* 667 F.2d 452, 454 (4th Cir.), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982) (following reasoning of *United States v. Tedesco,* 635 F.2d 902, 905 (1st Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981), as to proper venue under section 1503).[7]

---

**6.** The difficulty in ascertaining the single purpose of a particular statute, even where one exists, or for that matter the *purposes* of a given provision, underscores the unsuitability of a general purpose standard for determining venue. Here, for example, while the majority assumes that the purpose of section 1513 is "to protect the integrity of the judicial system," *ante* at 7, it may well be that the primary purpose was merely to protect *certain individuals* whose personal safety might be threatened because they witnessed a crime. Section 1513 was enacted as part of the "Victim and Witness Protection Act," Pub.L. No. 97–291, 96 Stat. 1248 (1982) (emphasis added),

and the stated purpose of that Act was "to strengthen existing legal protections for victims and witnesses of federal crimes." S.Rep. No. 532, 97th Cong., 2d Sess., pt. I at 1, U.S.Code Cong. & Admin.News 1982, p. 2515. For purposes of this dissent, however, I will assume that at least a purpose of section 1513 is to protect the integrity of the judicial system.

**7.** When *Kibler* and *Tedesco* were decided, 18 U.S.C. § 1503 was a general obstruction of justice provision, which proscribed influencing, intimidating or retaliating against witnesses. In

### B.

The majority relies upon our decision in *Kibler* and the First Circuit's decision in *Tedesco* to support both its initial venture into statutory purpose and its specific (and critical) conclusion, based upon its assumption as to the purpose of section 1513, that the section is essentially a "contempt of court" statute. *Ante* at 416, 419. Neither case, however, can be read to support either the majority's unfettered approach to venue analysis or an analogy of section 1513 offenses to traditional contempt of court offenses. In *Kibler*, our holding turned on our interpretation of the statute's written text, not its purpose. In fact, we expressly held that "analysis of the verbs defining the offense" establishes the situs of the crime as the district of the proceeding sought to be obstructed. 667 F.2d at 454. We did reference portions of the statute's legislative history. But we did so only to reinforce our interpretation of the statutory text. *Id.* at 454–55 (citing legislative history analysis from *Tedesco*, 635 F.2d at 905–06). The First Circuit recounted the legislative history of section 1503 in *Tedesco*, as the majority notes. Similarly, however, it did so not to divine the statute's general purpose, but rather to "bolster" its interpretation of the meaning of "the words of section 1503." 635 F.2d at 905. Neither case suggests that an inquiry into legislative purpose distinct from statutory text, or the legislative history as it may inform the meaning of the text, is appropriate in venue analysis.

The majority also misplaces reliance on *Kibler* and *Tedesco*, *ante* at 417 & n. 3, 419, for its specific conclusion that section 1513, like section 1503, essentially proscribes "constructive contempts" "punishable by the court whose authority is challenged regardless of where the contemptuous acts may have occurred." *Tedesco*, 635 F.2d at 905 (quoting *United States v. O'Donnell*, 510 F.2d 1190, 1195 (6th Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975)). While both cases do suggest this

conclusion, the legislative history on which they rely for their analogy of obstruction of justice offenses to contempt of court offenses establishes that, as a general matter, neither the section 1513 nor the section 1503 offenses should be treated as contempt of court offenses.

As the majority notes, section 1513 does derive from section 1503, which originated in the Act of March 2, 1831, 4 Stat. 487, "outlin[ing] the contempt jurisdiction of the federal courts." *Tedesco*, 635 F.2d at 905 (citations omitted). The very purpose of the Act of March 2, 1831, however, was to *distinguish* traditional contempts of court from the larger category of obstruction of justice offenses and to limit the availability of summary punishment to the former category. *See Nye v. United States*, 313 U.S. 33, 49, 61 S.Ct. 810, 816, 85 L.Ed. 1172 (1941) ("meticulous regard for those separate categories of offenses [obstruction of justice and contempt of court] must be had"). Congress achieved this objective by providing, respectively in sections 1 and 2, that traditional contempt of court offenses, *i.e.*, those committed in the presence of or near the court, would be subject to summary punishment, but that the "true crimes" of obstruction of justice, *id.* at 49, 61 S.Ct. at 816, *i.e.*, those committed outside the court's presence, would be punishable only upon indictment and trial. *See id.* at 45–49, 61 S.Ct. at 814–16; *see also id.* at 49, 61 S.Ct. at 816 (noting that a particular act covered by section 2 "may *also* be a contempt if committed in the 'presence' of the Court" (emphasis added)). Thus, section 2, from which both section 1503 and 1513 derive, proscribed a "separate categor[y] of offense[ ]" from the traditional contempt of court offenses, except in those instances where the obstructions were actually committed in "the 'presence' of the Court." *Id.* (quoting *Savin, Petitioner*, 131 U.S. 267, 276, 9 S.Ct. 699, 701, 33 L.Ed. 150 (1889)). Accordingly, there is no basis for concluding by analogy to traditional contempt offenses that venue under section 1513 should lie in the court whose authority was challenged.

1982, Congress amended section 1503 to apply only to influencing officers or jurors, and added sections 1512 and 1513 to cover tampering with and retaliating against witnesses, respectively.

Victim and Witness Protection Act of 1982, Pub.L. No. 97–291, 96 Stat. 1248, 1253, 1249, 1250.

The majority misconstrues this legislative history because of its uncritical acceptance of *Kibler*'s and *Tedesco*'s reliance on *O'Donnell*. *O'Donnell* mistakenly reasoned from the Supreme Court's opinion in *Nye* that although obstruction of justice offenses under section 2 of the 1831 Act are punishable only after indictment and trial, they are still "punishable by the court whose authority is challenged," as are the traditional contempt offenses in section 1. 510 F.2d at 1195. The legal effect of subjecting section 2 obstruction of justice offenses to the safeguards of criminal trials, and thus to the Sixth Amendment, however, is to make those offenses *punishable only by the court in whose district the crime was committed.*

At bottom, the majority attempts *ex post* to summon *Kibler* and *Tedesco* in support of its belief that venue should lie in Virginia, when in fact both cases dictate that venue is proper only in the District of Columbia. While both cases included excursions into legislative history, each concluded that venue under section 1503 was proper in the district of the judicial proceeding, *only because it was clear from the statutory text, which punished anyone who "endeavors to influence, obstruct, or impede, the due administration of justice,"*[8] *that Congress criminalized the conduct of affecting those proceedings.* In both cases, it was concluded that Congress' choice of these particular verbs confirmed that the "very nature of the crime [was] *affecting* ... the due administration of justice," and therefore that that criminal act was committed where the administration of justice was actually affected, *i.e.*, in the district of the judicial proceeding. *Tedesco*, 635 F.2d at 905 (emphasis added); *accord Kibler*, 667 F.2d at 454.[9]

Unlike section 1503, however, section 1513 does not proscribe the acts of "influencing," "obstructing" or "impeding" the due adminis-

tration of justice; it criminalizes only the discrete acts of "engaging in conduct," "causing bodily injury," "damaging property" and "threatening," none of which requires any effect on the administration of justice. *Cf. United States v. Cores*, 356 U.S. at 408 n. 6, 78 S.Ct. at 878 n. 6 (crimes of illegal entry "are not continuing ones, as 'entry' is limited to a particular locality and hardly suggests continuity"). The majority, as does the government, recognizes as much. (It is no mistake that Cofield himself relies principally on *Kibler* and *Tedesco*.) Indeed, it is this fact that forces the majority, at the government's behest, to elevate *Kibler*'s and *Tedesco*'s incidental discussion of the legislative history and purpose of the obstruction of justice statutes to the status of analytical primacy in the first place.

### III.

The perniciousness of the majority's holding is its intuitive appeal. Because Congress surely did assume that retaliation against a witness would represent an affront to the integrity of the judicial process, and because the integrity of the judicial process in the Eastern District, to the extent that that district is part of the "system" sought to be protected, undoubtedly was compromised by Cofield's act of retaliation, it "makes sense" that venue should lie in that district. The consequences of this holding for not only the Sixth Amendment right itself but for the policies behind the right, however, are almost imponderable. Presumably, for example, there will hereafter be nationwide venue for all prosecutions under section 1513, because the judicial system whose integrity it is the purpose of the statute to protect is equally represented in every federal district. This is especially true where, as here, *the proceeding on which venue is predicated was completed at the time of the retaliation.* For the dis-

---

8. 18 U.S.C. § 1503, *amended by* 18 U.S.C. § 1503 (1982) (emphasis added).

9. Reasoning similarly, some courts have held that *when Congress defines an offense with verbs that themselves point to a particular effect or result,* venue lies wherever the effect of the criminal conduct is felt. *E.g., United States v. Barham*, 666 F.2d 521, 523–24 (11th Cir.), *cert. denied*, 456 U.S. 947, 102 S.Ct. 2015, 72 L.Ed.2d

470 *and reh'g denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982) (obstruction of justice); *see also United States v. Craig*, 573 F.2d 513, 517 (7th Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978) (Hobbs Act violations for "affecting or obstructing" commerce, 18 U.S.C. § 1951, may be tried in any district where commerce is affected).

trict of a completed proceeding certainly no better represents the "judicial system" than does any other district.

Moreover, because virtually all federal criminal statutes have as their purpose the protection of some national interest or instrumentality, the majority's purpose test logically would lay venue for almost every federal offense in every federal jurisdiction. The "purpose" of the criminal tax laws, for example, is to "protect the public interest in preserving the integrity of the nation's tax system." U.S.S.G. § 2T (Introductory Commentary). The integrity of the tax system is no more compromised in the district where the acts of tax fraud or evasion were committed than in the districts where they were not. Similarly, the purpose of the antitrust laws is the "protection of the public from the evils of restraints on the competitive system." *Shotkin v. General Electric Co.*, 171 F.2d 236, 238 (10th Cir.1948). Because the evils incident to any monopolization of a national market are felt throughout the national economy, under the majority's approach venue in antitrust prosecutions would lie in any federal district court. And any criminal charge under the Endangered Species Act of 1973 (codified as amended at 16 U.S.C. §§ 1531–1543) could be prosecuted in any federal district, because the losses sustained through violations of that Act equally deprive all jurisdictions of the abundance of protected species. The majority's holding that venue lies wherever the purpose of a statute is undermined or the effects of its violation felt thus invites, if not assures, precisely the excessive "leeway" in venue determinations that the Framers feared, and Justice Frankfurter observed,

> not only opens the door to needless hardship to an accused by prosecution remote from home and from appropriate facilities for defense[ ] [but] also leads to the appearance of abuses, if not to abuses, in the selection of what may be deemed a tribunal favorable to the prosecution.

*United States v. Johnson*, 323 U.S. 273, 275–76, 65 S.Ct. 249, 250–51, 89 L.Ed. 236 (1944).

\* \* \*

The Constitution, not public policy, dictates venue in federal criminal prosecutions. Cofield was charged with and convicted of violating 18 U.S.C. § 1513 for retaliating against Sheila Wormley for her testimony in a judicial proceeding. He committed this offense entirely within the District of Columbia. The Eastern District of Virginia may have an interest in prosecuting Cofield because, as part of the judicial system, it felt the effects of Cofield's crime. The general purposes of section 1513 might even be furthered by permitting prosecution there. But Cofield has a right under the Constitution to be tried where his offense was committed. I would accord him that right, and I respectfully dissent from the majority's failure to do so.